27 C.C.P.A.(Patents)

## CRECCA v. RIPPEN.

### Patent Appeal No. 4274.

Court of Customs and Patent Appeals.
May 29, 1940.

J. F. Mothershead, of Washington, D. C. (T. Hayward Brown, of Washington, D. C., of counsel), for appellant.

P. E. Henninger, of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal, in an interference proceeding, from that part of a decision of the Board of Appeals of the United States Patent Office reversing that of the Examiner of Interferences and awarding priority of invention of the subject matter of counts 6 and 7 to appellee.

The interference was first declared October 9, 1934, and involved one application of appellant, serial No. 686,095, filed August 21, 1933, and two of appellee, serial No. 581,137, filed December 15, 1931, and serial No. 606,620, filed April 21, 1932. The interference contained five counts.

On February 18, 1935, appellant moved under Patent Office Rule 109 to add certain additional counts to the interference. The motion was denied by the examiner. Upon appeal the Board of Appeals reversed the examiner as to proposed counts B and E, which upon a redeclaration of the interference became counts 6 and 7. The interference was redeclared on November 5, 1936, and involved counts 1 to 7 inclusive.

Appellant took testimony and appellee was not present nor represented when the testimony was taken. Appellee, the senior party, took no testimony, relying on his filing date of December 15, 1931, with respect to counts 1 and 2, and upon his filing date of April 21, 1932 with respect to counts 3 to 7 inclusive.

The Examiner of Interferences in his decision awarded priority of invention to appellee as to counts 1 to 5, inclusive, and to appellant as to counts 6 and 7.

Both parties appealed, and the Board of Appeals affirmed the decision of the Examiner of Interferences as to counts 1 to 5, inclusive, and reversed the decision as to counts 6 and 7. From the decision of the board appellant has taken appeal to this court as to counts 6 and 7 only.

The counts read as follows:

"6. The combination of a sheathed metallic member, sheathing thereon having at least one through opening, a metallic holding member weld-deposited in said opening at one of its ends to said metallic member, the relative perimeters of said through opening and of said holding member being such that the holding member is spaced from the wall of the through opening throughout at least the major portion of the length of the holding member to obviate charring of said spaced portion of said wall of said through opening during welding, and means coacting with said holding member and said spaced portion of said wall of said through opening for securing the sheathing to the sheathed member.

"7. The method of securing an area of through-perforated sheathing to a metal area comprising the steps of laying the perforated sheathing on the metal area and maintaining the same through the remain-

ing steps in the position in which the same is desired to be secured; inserting in each perforation the selected one of a pair of coacting fastening members; welding an end of said inserted member to the sheathed metal area as the same is positioned in said perforation by employing a welding heat liable to harmfully affect the sheathing; insulating the sheathing from the harmfulness of said heat during the welding by the utilization of an intervening space extending throughout at least a substantial portion of the length of the welded member, and finally securing the position-laid sheathing to the metal area by a coaction of said pair of fastening members to cause a securing effect in at least a portion of the perimeter of said perforation."

The invention in issue relates to means for fastening sheathing or decking, usually of wood, to imperforate metal surfaces or decks, such as the steel decks of battleships and other ships of steel construction, and to a method of laying and securing said sheathing to such metal surfaces. The chief object of the invention defined in the counts is to eliminate the necessity of boring holes in the metal of said surfaces.

As far as this appeal is concerned, the only application of appellee involved is his later one filed April 21, 1932.

Both of the tribunals below awarded to appellant a date of conception prior to April 21, 1932, and their holdings in this respect are not questioned. The Examiner of Interferences also held that the appellant exercised reasonable diligence from just prior to April 21, 1932, when appellee entered the field, until his reduction to practice in July 1932.

The Board of Appeals in reversing the decision of the Examiner of Interferences stated: "After careful consideration of the record in the light of the briefs, we are of the opinion that if the Crecca Exhibits 3 and 5 support these counts, the decision of the Examiner of Interferences is proper. We are not unmindful of the fact that the Courts have held that a party may not lay aside one invention to complete another but we believe that the course pursued by the party Crecca over the short time when diligence was required as to these counts is a reasonable one and may be regarded as constituting diligence. We are also of the opinion that the charring which is visible is not of such a nature as to warrant a ruling

that the operations were unsatisfactory and did not constitute a reduction to practice of the procedure followed."

The board then held that the making and testing of Exhibits 3 and 5 did not constitute a reduction to practice of the invention defined in counts 6 and 7. The conclusion of the board was based upon what it considered to be the meaning of the following portions of the counts coupled with what the record disclosed as to the making and testing of the said exhibits:

"[Count 6] * * * the relative perimeters of said through opening and of said holding member being such that the holding member is spaced from the wall of the through opening throughout at least the major portion of the length of the holding member to obviate charring of said spaced portion of said wall of said through opening during welding, * * *

"[Count 7] * * * welding an end of said inserted member to the sheathed metal area as the same is positioned in said perforation by employing a welding heat liable to harmfully affect the sheathing; insulating the sheathing from the harmfulness of said heat during the welding by the utilization of an intervening space extending throughout at least a substantial portion of the length of the welded member, * * *"

Exhibit 3 comprises a sheet of steel about six inches square to a face of which is attached a square block of hard wood, probably teakwood. The block has been bored through, the circular perforation being of two diameters, the larger of which is about one and one-half inches and extends from the surface into the block for a distance of about one inch. The diameter of the smaller portion of the perforation is about three-quarters of an inch. A shoulder is thus formed about at the junction of the two diameters, and upon this shoulder the fastening means or nut holds the block to a threaded stud which, at its other end, is welded to the steel plate. Around the base of the stud there is a ring of what is apparently fused metal. There is a small space between the stud and the wall of the perforation throughout the smaller diameter.

Exhibit 5 shows in effect the same structure, although it is about three times as long as Exhibit 3.

The following testimony with respect to the claimed reduction to practice by appel-

172

lant we think indicates the manner in which the welding was done on the said exhibits: "* * * When applying this method through the wooden planking to the deck we found a considerable amount of scorching of the wooden deck occurred when the arc was made. To offset and remedy the scorching of the wooden planking various insulation materials were tried. The first materials were copper, which proved entirely unsatisfactory; second, tube mica which also proved entirely unsatisfactory; third, damping of the wooden planking bore. The method gave fair results but was deemed unsatisfactory. Fourth, compositions of clay mixed in with cement were formed and found to be under tests too brittle and injurious to the welding material. Other compositions were tried, the names of which I have forgotten, and finally lava rock was tried and found to be entirely satisfactory for the purpose desired."

The Examiner of Interferences stated that the record is not clear as to whether or not any special precautions were taken in the welding operation on the two exhibits to prevent undesirable charring. He then stated:

"* * * In any event it is held that the method of count 7 was performed when these exhibits were made since it is apparent that the stud is spaced from the sheathing sufficiently to constitute 'insulating the sheathing from the harmfulness of the said heat.' That some additional insulation, such for example as the lava ring shown in the photographs, Exhibit 6, might also be desirable in actual practice does not exclude such expedient from being within the scope of count 7.

"It is noted that count 6 includes this idea in somewhat different terminology, to wit: '* * * the holding member is spaced from the wall of the through opening throughout at least the major portion of the length of the holding member to obviate charring of said spaced portion of said wall * * * during welding.' This language, when given a natural and logical construction, likewise does not exclude the use of additional insulating means so long as the spacing provides the insulation throughout the major portion, or more than one-half of the length of the stud or welded element. In the actual practice in the Navy, Crecca meets this condition since his lava ferrule is located at the very lowest por-

tion of the opening in the planking (through opening) and is relatively short in comparison to the stud, as is clearly shown in the photographs, Exhibit 6. These photographs convincingly demonstrate that the upper two-thirds of the stud is insulated from the wooden planking only by the intervening air space. Hence, these elements are spaced 'throughout at least the major portion of the length of the holding member.'

"Accordingly, in the case of Exhibits 3 and 5, it becomes immaterial whether such a ferrule was or was not used during the welding operation, and the making of these exhibits is likewise deemed to constitute a reduction to practice of count 6."

We do not think, from an examination of the record, there can be any question but that a bushing of lava rock was used in the construction of Exhibits 3 and 5. Apparently, however, the Examiner of Interferences did not think the use of lava rock made any difference, if the lava bushing was relatively short in comparison to the length of the stud. We are of opinion that the record here does not warrant the holding of the examiner that the exhibits show sufficient space between the stud and the sheathing to insulate the sheathing from the harmfulness of the heat generated in the welding. There is no evidence that it does. On the contrary, the uncontradicted testimony of the witness Scott hereinbefore quoted indicates that in order to obviate the harmful effect of heat when the arc was made it was necessary to find an efficient insulator to place in the space between the stud and the sheathing. From the fact that lava rock was placed around the lower portion of the stud, at the base of which the arc was formed, it must be necessarily concluded that the sheathing was not only insulated from excessive heat at the base of the stud but also further up through the perforation.

We think that the reasoning of the Board of Appeals on the question of the use of the lava rock in connection with the meaning of the counts is correct. In its decision it is stated:

"While it is true that the lava rock may not have extended up through a major portion of the bore, we believe that the record indicates that the party Crecca relied upon this material to prevent charring rather than the provision of a free space sufficiently large to ac-

complish this purpose. We can see no reason why the lava rock should have filled the major portion as apparently it was only at the lower portion where substantial charring would occur. It has not been pointed out, nor have we noticed, where in the Crecca record there is a definite statement of the idea of providing an empty space of sufficient size to prevent the objectionable charring.

"We have considered the examples and arguments as to the meaning of a space in the party Crecca's brief, but we are satisfied that it is a forced construction and unreasonable to interpret the following portion of count 7 'insulating the sheathing from the harmfulness of said heat during the welding by the utilization of an intervening space extending throughout at least a substantial portion of the length of the welded member' as applying to a procedure where a shield of solid material, such as lava rock, was employed to prevent the charring rather than an open space.

"While in count 6 the corresponding language is perhaps not quite as definite, we consider that it was intended to and in fact does, have this meaning when given the natural and usual interpretation."

Appellant contends quite vigorously that the interpretation placed by the Board of Appeals upon the portion of the counts relating to space between the stud and the surrounding perforation of the sheathing is not proper. According to the reasoning of appellant, it would be logical to fill the entire space with an insulator of some kind and by so doing the structure would embody the invention defined by the counts. In the brief of appellant it is stated: "* * * Instead of depending upon air spacing alone various materials were tried to insulate the welding heat from the wood. Some insulators were found to be entirely unsatisfactory and others were partially satisfactory. Finally lava rock bushings were used with complete success. The mode of using the lava rock ferrules or bushings was to insert the bushing through the small bore in the wooden deck planking after it was laid, so that the bushing occupied at least a part of the space between the planking and the stud to be welded, and then to place the arc inducing flux material into the ferrules or bushings between the stud and plate members to be welded and then welding the stud. * *"

And that: "It is to be noted in this connection that count 7 does not require the spacing between the sheathing and the fastening member or stud to be occupied by air only. This count calls for the step of 'insulating the sheathing from the harmfulness of said heat [the heat incident to welding] during the welding by the utilization of an intervening space extending throughout at least a substantial portion of the length of the welded member'. Obviously, this step of insulating the sheathing from the heat is best accomplished by the use of a good heat insulator between the sheathing and the source of heat rather than by a poorer one such as air alone. In view of this fact, it is submitted that the inclusion of the insulating ferrules in the space between the sheathing and the stud being welded in the making of Exhibits 3 and 5 does not destroy the spacing between these members, but, on the contrary, makes that spacing more effective for the very purpose for which it is entended, namely, for the purpose of insulating the sheathing from the harmful effects of the welding heat."

■ It is our opinion from a careful study of the application of appellant that there is no disclosure of the use of any means for insulating the walls defining the passage through the wood from the harmful effect of heat during welding, other than the use of a space between the welded holding member and the walls of the plank. Had appellant intended the space between the holding member and the said walls to require a separate insulating member such as appears in the record here—and it unquestionably was used in his alleged reduction to practice—he would have disclosed such an arrangement in his space and would have used other and more appropriate language in the counts. In the absence of more appropriate language we cannot read such limitations into the counts. James v. Clayton, Kerrick & Stadt, 90 F.2d 337, 24 C.C.P.A., Patents, 1329.

■ The counts had their origin in appellant's motion to amend and we think that by a normal construction the terms "spaced" and "space" as appearing in counts 6 and 7, respectively, as disclosed in appellant's application, can have no other meaning than that the space so defined be in and of itself effective to prevent charring. In the record here there is no

proof to indicate that Exhibits 3 and 5 were successfully made without the use of lava rock, and, therefore, in our opinion, the reasoning and conclusion of the board is correct.

The decision of the Board of Appeals is affirmed.

Affirmed.