**552**

Elliot B. PALEY and Pern E. Henninger, Trustees,

v.

.The UNITED STATES.

No. 49583.

United States Court of Claims.

May 1, 1956.

Pern E. Henninger, New York City, for plaintiffs. Paul M. Niebell, Washington, D. C., was on the briefs.

Francis H. Fassett, New York City, with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

Clarence D. Kerr and William J. Barnes, New York City, filed a brief for Bethlehem Steel Co. as amicus curiae.

Arthur Raisch, Detroit, Mich., filed a brief for Nelson Stud Welding Division of Gregory Industries, Inc., as amicus curiae.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiffs are the owners of patent Reissue No. 22,091 issued to Nicholas Rippen. They claim that the United States, in its construction of ships and in having ships built for it by contractors, has used the methods and the structures covered by the patent. They sue to recover compensation for that use, under the Act of June 25, 1910, as amended, the statute, as here pertinent, being section 1498 of Title 28, U.S.C.1946 Ed., Supp. III. At the present stage of the case, only the issues of validity and infringement are involved. A trial of these issues has been had before a commissioner of this court, and the court has had the benefit of briefs and oral arguments of the parties, as well as briefs *amici curiae* presented by two other parties, the two *amici* supporting the position of the United States.

The patent specification describes a method of fastening sheathing or covering to a metal surface by welding to the metal surface the fasteners which, extending through holes in the sheathing, will hold the sheathing against the metal surface. The use by the Government of which the plaintiff complains is the fastening of wooden planking to the metal decks of ships.

What the Government does is lay the wooden plank on the metal deck, drill a hole through the plank large enough to allow the proposed bolt or stud and a surrounding washer or "ferrule" to pass through the hole, then counter-bore a somewhat larger hole through the upper part of the thickness of the plank, so that the bottom of the counterbore forms a shoulder against which . a nut, to be screwed on the bolt or stud, will press. Then the stud which is shorter than the

thickness of the plank, and is threaded at the upper end, and at the lower end contains some flux which is necessary for welding, is inserted in a welding gun. The gun is a device connected with electric wiring so that when it is switched on by pressing a trigger an electric current passes through the metal deck of the ship and into the stud, if it is pressed against the deck. The gun then withdraws the end of the stud from the deck about one-eighth of an inch, the electric current jumping across this gap forms an arc, creating a heat of about 3,000 degrees, the heat in less than one-half of a second melts the end of the stud and the metal of the deck at the end of the stud; the electric current is switched off, the gun plunges the stud against the deck and the weld is completed. When all the studs necessary for a plank have been thus welded to the deck, the plank is lifted off the studs, grease is smeared on the deck to preserve it and the plank, the plank is replaced on the deck, nuts are screwed on the threaded ends of the studs, which nuts have shoulders wide enough to rest on the bottoms of the counter-bores in the plank and draw the plank down tightly against the deck. Wooden plugs are then driven into the holes to give the plank a smooth and watertight surface. The sketches reproduced in connection with our finding 15 are intended to illustrate the Government's method and structure.

The method and structure disclosed by the Rippen patent are illustrated by figures 5 and 7 in our finding 7. A description of what is shown in figure 5, with the addition of one matter not shown in the figure, but described in the specifications, will be sufficient for our purposes. A tapered or cone-shaped hole is bored in the sheathing plank. In the middle of the hole is set a hollow or tubular stud which we will call a thimble, threaded on the outside so that a nut can ultimately be screwed on it. A hand arc-welding device is then inserted in the thimble. This is a wire or small rod of metal which, when the arcing takes place melts at the end and deposits its

metal against the thimble and the metal deck, fastening the two together. In the Rippen method, the thimble is at first merely "tack-welded" to the deck, i. e., it is welded in only two or three spots, presumably enough to hold it in place in the center of the hole in the plank, and hold it in a vertical position. Then the plank could be removed, if that was thought desirable, or it could be left in place, and the thimble could then be thoroughly welded, by again inserting the wire or rod electrode and depositing metal all around the inside of the bottom of the thimble. A tapered or cone-shaped nut would then be screwed on to the thimble, which, as we have seen, is threaded on the outside. The conical nut would draw down against the cone-shaped hole in the plank, and fasten it to the deck.

In the Rippen device, it was foreseen that charring of the wood of the plank would be a serious problem, especially since the hand welding operation would take from one-half a minute to three minutes for completion. Claims 10 and 12 of the patent, as shown in our finding 12, purport to solve that problem by leaving a space between the outside of the thimble and the adjacent surface of the hole in the wood. Our commissioner has found that leaving such a space was not original with Rippen, and we think that if it had been original it would not have been invention. In claims 11 and 13 of Rippen the insertion of a heat-resisting material between the thimble and the wood is suggested. Our commissioner has found that this was original with Rippen, and was invention.

Rippen's interest in the charring of the wood of the sheathing was the result, it seems to us, of the ineptness of the device which he designed. The tapered hole in the sheathing, and the tapered nut to fit the hole, put the tapered nut near the bottom of the hole in the plank, i. e., near the point where the welding was to take place and the intense heat was generated. If the plank was charred at that point, the nut would meet only weak resistance when it was turned

down. Having, by the other parts of his device, created a problem, he offered a solution for it.

But the weakening of the wood by charring was not a problem for those who were using the conventional and much more effective method of fastening the plank down by a nut with a shoulder which rested on the bottom of a counter-bore some inches away from the place where the welding took place and the heat was generated.

The problem of the industry was not the problem of the charring and thus weakening of the wood by the heat of the welding process. It was a quite different problem of which the plaintiff was completely unaware. If a weld takes place in the open air, and particularly if that air is filled with smoke and gases, such as those from burning wood, the weld is porous and weak. For that reason it is desirable, and in order to obtain the strength which is necessary to hold down the planking on a battleship, necessary, that the weld take place in an enclosure shielded from the air and from the impurities which the air may contain.

We have said that Rippen did not insert the insulation in his invention in order to improve the weld. In his claim 11 he said that he put it in "to insulate the sheathing from the harmfulness of heat during the welding". In his claim 13 he said that he put it in "to obviate charring of said spaced portion of said wall of said through opening [in the sheathing] during welding." And in his claims 10 and 12 he prescribed space instead of insulation, and a relatively small space of course would have had no effect upon the circumstances which weakened the weld.

In the Government's process as we have described it, we said that there was inserted around the bottom end of the stud a ceramic washer or ferrule. Its principal advantage, probably, is that it prevents air contaminated by the smoke and gases which are inevitable when welding is done in close proximity to wood, from weakening the weld. It also prevents the molten metal and flux from spreading and making an unsightly and perhaps a weaker weld. Experiments made by welding with, and without, the use of the ferrule, show that in neither case is there any charring which would weaken the wood and the hold which the conventional shouldered nut would take upon the counter-bore in the wood.

It is the ceramic washer or ferrule at which this suit is aimed. It is not used to cure the evil at which Rippen's insulation was aimed, but another evil of which he was unaware. It is urged that his unawareness was immaterial, that if his insulation had another effect, beneficial, though unintended by him, his patent would still prevent others from using his device.

This may well be the law of patents. But taking it as the law, it leads to the conclusion that Rippen was not the inventor. In our finding 27 we speak of an article on the Cyc-Arc Process of Automatic Electric Welding, published in 1922, more than 10 years before the filing date of the Rippen patent. This article was by two of the three inventors named in the Steele patent in 1922 for an electric welding gun for welding steel studs to metal plates, which patent we discuss in finding 26. The patent says:

"A shield may be provided for protecting the arc * * * from air currents * * * [this] may be effected by enclosing the stud-holder and arc in a suitably insulated casing which may be * * * if desired of refractory material."

The article also mentions a shield to prevent the welding arc from being blown by air draughts.

It may well be that the inventors in the Steele patent in 1922 were unaware of the particular harmful effect on the weld of welding in open air which contained wood smoke and gases, just as Rippen was unaware that either open air or smoke-filled air had anything to do with the quality of the weld. But the Steele protection of the weld from air currents

was a long step nearer the problem of the industry than Rippen's protection of the wood from charring. The fact that the ferrule is used in all stud welding, whether the welding is done in the presence of wood or not, shows how much nearer Steele's 1922 idea was to the problem than Rippen's later idea.

We have grave doubts as to whether one who finds that it is necessary, in order to get a good weld, to put some noncombustible material around the place of the welding to keep out the air, should be told that someone else has a statutory monopoly upon this rather obvious solution of the problem. Patents ought not to be allowed to have the effect of "subtract[ing] from former resources freely available to skilled artisans." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162.

Our conclusion is that the claims, here involved, of the plaintiffs' patent are invalid. In Paley v. Bethlehem Steel Company, D.C., 114 F.Supp. 579, a suit by the plaintiffs against a defendant which used a somewhat different method and structure from those used by the Government in this case, the United States District Court for the District of Massachusetts, held that the plaintiffs' patent had not been infringed. That decision was affirmed by the Court of Appeals, 1 Cir., 209 F.2d 510.

Since we have concluded that the claims, here involved, of the plaintiffs' patent are invalid, we do not reach the question of infringement.

The plaintiffs' petition will be dismissed.

It is so ordered.

LARAMORE and LITTLETON, Judges, concur.

WHITAKER, Judge, with whom JONES, Chief Judge, concurs (dissenting).

In the majority opinion it is held that the plaintiffs' patent is invalid because anticipated by the prior art. The prior art cited in the opinion is the Steele patent issued in 1922, and an article by two of the three inventors named in the Steele patent on the subject of "The Cyc-Arc Process of Automatic Electric Welding."

The Chief Judge and I are of opinion that this patent and this article do not disclose the invention covered by claims 11 and 13 of plaintiffs' patent, which claims plaintiffs allege the defendant has infringed.

The feature of plaintiffs' invention which they claim has been infringed was the use of a heat-resisting ferrule or shield around a stud when it is welded to a metal surface through a hole in wood planking. The purpose of this ferrule or shield was to prevent charring of the wood during the welding of the stud to the deck. Plaintiffs' claim 11 called for a "heat-resisting material" between the inserted fastening member and the sheathing. It is not disputed that the defendant used such a heat-resisting material.

Defendant filed an application for a patent on a method of welding a fastening member to a steel surface to secure planking, and in its application it called for insulating the planking from the welding heat by utilization of the space between the member and the planking. When this came to plaintiffs' attention, plaintiffs amended their patent application to include such claims. The Patent Office declared an interference proceeding to determine the first inventors of this method. This interference proceeding was decided in favor of plaintiffs. It held that plaintiffs were the inventors of this method, rather than the defendant. An appeal was taken by the defendant to the Court of Customs and Patent Appeals, which affirmed the decision of the Patent Office Board.

The question now is whether or not the Steele patent and the article on the Cyc-Arc welding anticipate the claims in suit.

The Steele patent covered certain "improvements in or relating to electric

welding." On page 2, lines 51–57, in the specifications, it was stated:

"A shield may be provided for protecting the arc from magnetic effects and/or air currents. This may be effected by enclosing the studholder and arc in a suitably insulated casing which may be of steel, iron, or other suitable metal, or if desired of refractory material."

This is alleged to have anticipated plaintiffs' disclosure of a heat-resisting shield around a bolt to prevent the charring of the wood.

Also, in the article on the Cyc-Arc Process of Automatic Electric Welding it was stated:

"If the apparatus is properly adjusted and the plates are clean, the only likely trouble is that due to currents of air (such as those in draughty passages), which may cause the welding arc to be blown to one side, if not actually extinguished. In such cases, steps must be taken to shield the stud welder from excessive draughts."

This also is alleged to have disclosed the principle embodied in plaintiffs' claims.

We do not think either of these publications anticipate plaintiffs' claims because the shield used by Steele and in the Cyc-Arc process was not for the purpose of preventing the charring of the wood. Indeed, these publications do *not* disclose the concept of stud welding *in the presence of a wooden deck plank*.

The shield called for in the Steele patent was evidently not designed to prevent charring because it was specified that it might be "of steel, iron, or other suitable metal, or if desired of refractory material." Since either iron or steel or a refractory material was specified, Steele evidently did not have in mind a shield which would prevent the charring of the wood, because, had steel or iron been used as a shield, the same heat that was sufficient to weld the bolt to the steel surface would have been sufficient to heat or melt the metal shield, the heat from which of course would have charred the wood. It was only by the use of refractory material that the charring of the wood could be prevented. But Steele did not say that a refractory material had to be used, or that stud welding could be done with wood planks in place on the deck if refractory material was used.

On the other hand, the plaintiffs specifically called for a "heat-resisting material." To accomplish the purpose plaintiffs had in mind, iron or steel would have been unsatisfactory.

Furthermore, the article on the Cyc-Arc Process of Automatic Electric Welding clearly shows that Steele was not concerned with the problem of preventing harmful charring of wood. This shows, in the portion quoted above, that his object was to prevent the displacement of the weld by air currents in draughty passages. He had no thought of prevention of the burning of surrounding wood, and the deleterious effects thereof.

It is significant that this Steele patent was cited by the Patent Office in acting upon the Government's application for a patent, and that it was also mentioned and under consideration in the interference proceeding between the Government's application and plaintiffs' application. The Patent Office evidently did not think that it anticipated the plaintiffs' patent, and of course their decision is presumptively correct. In addition, the Court of Customs and Patent Appeals, the court specifically created for the consideration of such questions, affirmed the decision of the Patent Office. In a case as close as this one, and where the prior art was considered, the presumption of the validity of a patent issued by the Patent Office and passed on by the Court of Customs and Patent Appeals should prevail. The Chief Judge and I are not convinced that the Steele patent and the article referred to so clearly disclosed the invention covered by plaintiffs' claims as to rebut this presumption.

Now it is said that one of the chief benefits to be derived from the shielding

of the bolt during the welding process is to prevent the smoke and gases from the burning wood from permeating the weld and making it porous; and that the plaintiffs did not have this in contemplation when they specified the shield. There are two answers to this: The first is that the defendant did not use the shield for this purpose either. Nor did Steele. And the next answer is that a patent is good for all beneficial uses whether contemplated by the patentee or not.

For these reasons we respectfully dissent.

**George T. GOGGIN, Trustee in Bankruptcy in The Matter of Eugene C. Brisbane, Bankrupt, and Brisbane & Company, a Limited Partnership, Bankrupt.**

v.

**The UNITED STATES.**

No. 49224.

United States Court of Claims.
May 1, 1956.